

**SIGNED this 30th day of January, 2015**

Marcia Phillips Parsons
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

---

**[This opinion is not intended for publication as the precedential effect is deemed limited.]**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE

In re

      BENJAMIN COLT MASON,
                    Debtor.

| | |
|---|---|
| | No. 13-50470 |
| | Chapter 11 |

THE FIRST BANK AND TRUST COMPANY,

      Plaintiff,

vs.

GREGORY K. MASON, BENJAMIN C. MASON,
NORMA J. MASON, DEBORAH L. MASON,
JEFFERSON FEDERAL BANK f/k/a State of
Franklin Savings Bank, and FREDRICK BRANDT,
Trustee,

      Defendants.

Adv. Pro. No. 13-5026

## M E M O R A N D U M

APPEARANCES:

Rick J. Bearfield, Esq.
Post Office Box 4210 CRS
Johnson City, Tennessee 37602
*Attorney for Plaintiff*

Dean Greer, Esq.
Post Office Box 3708
Kingsport, Tennessee 37664
*Attorney for Defendants Benjamin and Norma Mason*

  **Marcia Phillips Parsons, Chief United States Bankruptcy Judge.**  In this adversary proceeding, First Bank and Trust Company (the "Bank") seeks a determination that the transfer by Gregory and Deborah Mason (the "Masons") of the business Collectors Cove to their son Benjamin Colt Mason (the "Debtor") was fraudulent under Tennessee law.  For the reasons discussed hereafter, the Bank will be awarded judgment against the Debtor in the amount of $59,026.12.  This is a core proceeding.  *See* 28 U.S.C. § 157(b)(2)(H).

I.

  On March 15, 2013, the Debtor filed a voluntary petition for bankruptcy relief under chapter 11.  As set forth in his schedules and statements, the Debtor does business as Collectors Cove, a sole proprietorship that operates a retail store selling gifts and collectibles, including coins, jewelry, and sport and movie memorabilia.  Prior to the bankruptcy filing, the Bank filed a fraudulent conveyance action against the Debtor, his wife Norma and the Masons in state court, alleging that the parents' sale of the business and its assets to their son was fraudulent, but seeking only to set aside the real property conveyed in connection with the sale or a money judgment.  After filing his bankruptcy case, the Debtor removed the state court action to this court, thereby initiating this adversary proceeding.[1]

  A trial was conducted on September 3, 2014, at which the Masons, the Debtor and the Bank's senior vice president, Julia Bell, testified.  The evidence established that on October 1, 2009, the Masons entered into a written agreement with the Debtor to sell to him the business of Collectors Cove as a going concern (the "Sale Agreement").  As set forth in Exhibit A to the Sale Agreement, the parties valued the business' assets at $1,468,082.  The assets listed were inventory valued at $393,082; miscellaneous personal property such as furnishings, equipment and vehicles of $20,000;

---

[1] Because the Masons obtained a chapter 7 discharge subsequent to the filing of this action, and any relief obtained by the Bank in this action would not impact Jefferson Federal Bank and Fredrick Brandt, the Bank voluntarily dismissed these defendants on the eve of trial.  The court presumes that the Debtor's wife, Norma Mason, was included as a defendant because she was named as a grantee along with the Debtor on one of the quitclaim deeds for the real properties transferred in connection with the sale of Collectors Cove.  However, the Bank does not seek a money judgment against Norma Mason.

2

and two tracts of improved real property in Sullivan County, Tennessee, a 7.239 acre tract valued at $750,000 and a 1.39 acre tract valued at $305,000.[2]   In return for these assets, the Debtor agreed to pay $30,000 in 60 monthly payments of $500 and assume liability for the repayment of all outstanding debt of the business, including debt secured by the real property and inventory.  The Sale Agreement did not delineate the business' debts.

The Debtor was not yet 27 years old when he entered into the Sale Agreement.  According to his and his father's testimonies, as a 15 year old teenager the Debtor had gone to his father and asked him to set up a flea market and trading business.  Mr. Mason, who had several business interests, then established Collectors Cove, with the Debtor working in the business on weekends while he was still in high school and then full-time after high school graduation.   The Debtor gradually assumed day-to-day management of the business, with his father helping out as needed.  According to Mr. Mason, in 2008 he had little time for Collectors Cove because of his obligations to his other businesses, so he and the Debtor began discussing in early 2009 the Debtor's purchase of Collectors Cove.

On November 9, 2009, a month after signing the Sale Agreement, the Masons quitclaimed the 1.39 acre tract to the Debtor and his wife.  Also on that date, the Debtor and his wife signed an assumption agreement with the State of Franklin Bank, concerning the Masons' indebtedness of $368,812.79 secured by the 1.39 acre tract.  Subsequently, on December 18, 2009, the Debtor signed a guaranty agreement for three of the Masons' First Tennessee Bank obligations totaling $1,022,293.21, secured by the 7.239 acre tract and by the inventory of Collectors Cove.[3]  Thereafter, the Debtor received a quitclaim deed from the Masons dated March 10, 2010, transferring to him

---

[2] The 1.39 acre tract is actually two parcels with three addresses located at 133, 135, and 139 Old Jonesboro Road, Piney Flats, Tennessee, although for ease of reference the parties have referred to these parcels collectively as the 1.39 acre tract. The adjacent 7.239 acre tract has an address of 145 Old Jonesboro Road.

[3] To determine the balances of the obligations owed to State of Franklin Bank and First Tennessee Bank as of the date of the Sale Agreement, the court used the last balance stated on each loan history immediately prior to October 1, 2009. The three First Tennessee Bank obligations guaranteed by the Debtor were notes 1509, 3296 and 7649 with account balances of $356,440.63, $172,739.75 and $493,112.83, respectively.

the 7.239 acre tract.[4]

Approximately eight months later, on November 30, 2010, the Masons filed a voluntary petition for personal bankruptcy relief under chapter 7. At that time, Mr. Mason was the president and owner of a 1/3 interest in Chuck Mason Equipment Sales, Inc., which had filed its own petition for bankruptcy relief under chapter 11 a year earlier on November 13, 2009. Mr. Mason also owned a 1/3 interest in Mason Brothers Partnership and Mason Brothers LLC. These companies also failed or ceased operations during this time period. The Bank was a creditor of all of Mr. Mason's companies, and of the Masons individually, based on a series of secured and unsecured loans that began in 1998. After the companies and the Masons defaulted on their loan obligations to the Bank, it foreclosed on its security and was left with a sizable loss.[5]

In this action, the Bank asserts that the Masons' sale of the business Collectors Cove was fraudulent under the actual fraud provision of Tenn. Code Ann. § 66-3-305(a)(1), or the constructive fraud provision of Tenn. Code Ann. § 66-3-306(a). In its complaint, the Bank sought only to set aside the transfer of the real properties or alternatively a money judgment. At trial, the Bank limited its requested relief to a money judgment against the Debtor in the amount of $130,000, which it contends represents the difference between the 2009 tax assessed values of the two tracts of real property and the value that the Masons actually received.[6] Specifically, the Bank alleges that the 1.39 acre tract was worth its tax assessed value of $447,000 rather than the $305,000 listed in the

---

[4] Inexplicably, the March 10, 2010 quitclaim deed also conveyed the 1.39 acre tract for a second time, but this time to the Debtor alone, rather than to him and his wife as in the first quitclaim deed.

[5] The exact amount of the loss was never specified at trial, but the Masons scheduled an unsecured debt to the Bank of over $4 million in their bankruptcy case, and the Bank represented in a proof of claim filed in the Chuck Mason Equipment Sales' bankruptcy case that it was undersecured by over $2 million.

[6] The Debtor's confirmed plan provides two alternatives for satisfaction of the Bank's claim in the event it prevails in this action. If the Bank is awarded a money judgment, the Debtor may provide for payment of the judgment by 60 equal monthly installments with 5.35% interest or surrender the 1.39 acre tract to the Bank and State of Franklin Bank, who has a first deed of trust on the property. The 7.239 acre tract was surrendered in the plan to First Tennessee Bank, which held a first deed of trust on the property.

4

Sale Agreement, while the 7.239 acre tract had a value of $785,000 rather than the Sale Agreement value of $750,000.

## II.

Under Tennessee law, a conveyance is deemed fraudulent against a creditor if it is made either with the actual intent to defraud, hinder, or delay a creditor or with less than "reasonably equivalent value" while the grantor was insolvent or became insolvent as a result of the transfer. *See* Tenn. Code Ann. §§ 66-3-305(a)(1), 306(a).[7]  The creditor challenging a particular conveyance bears the burden of proving that the transfer was fraudulent.  *See United Nat'l Real Estate, Inc. v. Thompson*, 941 S.W.2d 58, 62 (Tenn. App. 1996).  And even if a creditor can prove that a transfer was made with actual intent to hinder, delay, or defraud, "[a] transfer . . . is not voidable under § 66-3-305(a)(1) against a person who took in good faith and for a reasonably equivalent value . . . ." Tenn. Code Ann. § 66-3-309(a).

Because actual intent is difficult to ascertain, the Tennessee legislature has compiled a nonexclusive list of eleven factors for a court to consider in determining whether a conveyance was made with the actual intent to hinder, delay, or defraud a creditor.  *See* Tenn. Code Ann. § 66-3-305(b).  These factors are:

---

[7]  The pertinent provision of the actual fraud statute states:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation: (1) With actual intent to hinder, delay, or defraud any creditor of the debtor.

Tenn. Code Ann. § 66-3-305(a)(1).

The pertinent portion of the constructive fraud statute provides:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

Tenn. Code Ann. § 66-3-306(a)

(1) The transfer or obligation was to an insider;

(2) The debtor retained possession or control of the property transferred after the transfer;

(3) The transfer or obligation was disclosed or concealed;

(4) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) The transfer was of substantially all the debtor's assets;

(6) The debtor absconded;

(7) The debtor removed or concealed assets;

(8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) The transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

*Id.* Consideration of these "badges of fraud" is necessary "[b]ecause determinations of actual fraud are 'inherently fact-laden, turning on the case-specific circumstances surrounding the [tranferor's] decision to enter into the challenged transaction.'" *Farmer v. Rascko (In re Racsko)*, No. 11-3012, 2011 WL 4344300, at *8 (Bankr. E.D. Tenn. Sept. 14, 2011) (quoting *Lowe v. B.R.B. Enters., Ltd. (In re Calvillo)*, 263 B.R. 214, 220 (W.D. Tex. 2000)). "Proof of the existence of any one or more of the factors enumerated in subsection (b) may be relevant evidence as to the [transferor's] actual intent but does not create a presumption that [the transferor] has made a fraudulent transfer . . . ." Uniform Law Comment (5) to Tenn. Code Ann. § 66-3-305.

According to the Bank, the Masons conveyed the assets of Collectors Cove with the actual intent to defraud their creditors as indicated by the presence of several badges of fraud. Specifically, the Bank cites the parties' familial relationship, and argue that the Masons were in a precarious financial condition at the time of the transfers, as their primary source of income, Chuck Mason Equipment Sales, was failing and the Masons were facing claims and demands for millions of dollars. The Bank alleges that the Masons made the transfer to the Debtor in order to preserve their

one remaining income-producing asset, Collectors Cove, even though the Debtor did not otherwise have the financial means to pay the business' debts, as demonstrated by the fact that his personal income in 2008, the year before the sale, was only $18,036. Further, the Bank argues that the indebtedness assumed by the Debtor in consideration for the sale could not be funded from the operations of Collectors Cove alone, as the monthly payments on the debt were $11,665.08, while Collectors Cove's net income in 2008 was only $64,686, proof according to the Bank that the sale was a sham. The Bank alleges that the Debtor never paid the $30,000 required by the Sale Agreement, that the Masons were insolvent or became insolvent by the sale, and that the consideration paid by the Debtor for the two tracts of real property was not "reasonably equivalent" to their value, as demonstrated by their tax assessed values. As to these last two badges of fraud, the Bank maintains that they not only support its actual fraud claim under Tenn. Code Ann. § 66-3-305(a)(1), but that they also provide the required proof for constructive fraud under Tenn. Code Ann. § 66-3-306(a).

In response, the Debtor denies that his parents transferred the assets of Collectors Cove with the actual intent to defraud their creditors. The Debtor also disputes the Bank's valuation of the two tracts of real property and denies that he failed to pay the $30,000 sum. The Debtor points out that he had been running Collectors Cove for several years prior to its purchase, and that it had long been the parties' intention for him to purchase the business. Citing to the defense provided by Tenn. Code Ann. § 66-3-309(a), the Debtor asserts that he bought the business in good faith, that he was not privy to his parents' financial condition, and that he paid reasonably equivalent value for the assets. On this last point, the Debtor cites his assumption of the State of Franklin Bank debt and his guaranty of three obligations owed to First Tennessee Bank, which collectively totaled $1,391,106 on October 1, 2009. The Debtor also points out that after his purchase of the business he learned that the inventory and the 7.239 acre tract were further encumbered by two additional debts owed by the Masons to First Tennessee Bank totaling $141,449.88,[8] such that the total secured indebtedness he took over was $1,532,555.88, an amount he argues exceeds even the Bank's alleged

---

[8] These two debts and their account balances as of October 1, 2009, were notes 3349 and 6404 with respective balances of $90,577.80 and $50,872.08.

7

valuation of the assets. Lastly, the Debtor asserts that in addition to assuming the secured debt of the business, he also paid about $20,000 of the business' unsecured vendor debt.

Turning first to the Bank's claim of actual fraud based on the presence of various badges of fraud, the first badge of fraud is present because the Masons transferred Collectors Cove to their son, the Debtor, who is considered an insider under Tennessee law. *See* Tenn. Code Ann. §§ 66-3-305(b)(1) and § 66-3-302(7)(A)(i). The existence of such a family relationship requires a court to more closely scrutinize the transaction when measuring the value given by the transferee in return for the transfer. *See* Uniform Law Comment (5) to Tenn. Code Ann. § 66-3-305 ("a transfer to a closely related person warrants close scrutiny of the other circumstances, including the nature and extent of the consideration exchanged").

As to factors two and three, there was no evidence that after the sale the Masons remained in control of Collectors Cove or the property transferred, or that the transfer itself was concealed. The Debtor contacted the business' secured creditors to sign the necessary assumption/guaranty documents and continued making the payments due under the obligations. Moreover, the quitclaim deeds conveying the properties were duly recorded. The Masons' decision to sell does not appear to have been one made in haste because the Debtor had been managing the business for years, and he and his father had begun talking about a transfer in early 2009. Accordingly, these factors weigh against a finding of fraud.

With respect to factor four, that the transferor had been sued or threatened with suit before the transfer was made, the evidence did indicate that Mr. Mason and his companies were in financial difficulties at the time. His primary company, Chuck Mason Equipment Sales, filed for bankruptcy relief on November 13, 2009, only six weeks after the Debtor and the Masons executed the Sale Agreement, and only four days after the quitclaim of the 1.39 acre tract. The bankruptcy of Chuck Mason Equipment Sales was precipitated in part by the company's default on a debt in excess of $2 million to CNH Capital America LLC, which Mr. Mason had guaranteed. Mr. Mason was also a co-obligor on obligations to First Tennessee Bank that were also in default, although under a forebearance agreement executed in April 2009. Additionally, Julia Bell, the Bank's representative, testified that Mr. Mason informed her in the fall of 2009 that he had been selling out of trust,

presumably at Chuck Mason Equipment Sales, and the company would have to file bankruptcy soon. Thus, it is evident from all of the foregoing that the Masons were in financial distress at the time they transferred Collectors Cove, a fact that supports the Bank's fraud claim.

Factor five is that the transfer was of substantially all of the transferor's assets. On this point, it is undeniable that the Masons had significant business interests other than Collectors Cove. The Bank asserts, however, that Collectors Cove was the only business of the Masons that was producing income and a profit. The Masons' 2008 personal tax return indicates net income of $64,686 from Collectors Cove, a $227,962 loss from Mason Properties and Mason Brothers Partnership combined, and that Mr. Mason received a salary of $34,840 from Chuck Mason Equipment Sales. Similarly, the 2008 tax return of Chuck Mason Equipment Sales, of which Mr. Mason was a 1/3 owner, reveals a net loss in excess of $1.4 million, assets of almost $10 million, and gross sales of approximately $4.5 million. Thus, although Chuck Mason Equipment Sales had more assets than the Collectors Cove business and paid Mr. Mason a salary, the profit produced by Collectors Cove in 2008 was more than the Masons earned from their other businesses, at least in 2008. Moreover, in light of Chuck Mason Equipment Sales' bankruptcy filing on November 13, 2009,[9] even Mr. Mason's salary was potentially at risk. Consequently, the Bank's assertions about the importance of Collectors Cove to the Masons have merit.

Factors six, seven, ten and eleven are not present or applicable. The Masons did not abscond, or remove or conceal assets; the transfer did not occur shortly before a substantial debt was incurred; and the Masons did not transfer the essential assets of the business to a lienor.

The remaining factors, numbers eight and nine, are whether the consideration received by the Masons was reasonably equivalent to the value of the assets transferred, and whether the Masons

---

[9] The court takes judicial notice of the filings by Chuck Mason Equipment Sales in its bankruptcy case in this court, no. 09-53119. The summary of schedules lists assets of less than $7 million and liabilities of $9.43 million. As for the company's gross income, the statement of financial affairs lists almost $8.5 million in 2007, $4.5 million in 2008, and $2.3 million as of December 7, 2009, demonstrating a business on the decline. The statement also reflects that the company had a pending state court lawsuit, wherein CNH Capital America LLC was seeking to recover personal property and damages.

were insolvent or became insolvent as a result of the transfer.  These two factors are relevant not only for a determination of actual fraud under Tenn. Code Ann. § 66-3-305(a)(1), but are also the primary elements for constructive fraud under Tenn. Code Ann. § 66-3-306(a).

Considering the insolvency factor first, a statutory presumption of insolvency arises "if the sum of the [transferor's] assets in existence when the transfer occurs is greater than all of the [transferor's] assets, at a fair valuation." *In re Racsko*, 2011 WL 4344300, at *8 (quoting in part Tenn. Code. Ann. § 66-3-303(a)).  Tennessee's statutory definition of insolvency "is derived from the definition of 'insolvent' in § 101(29)(A) of the Bankruptcy Code."  Uniform Law Comment (1) to Tenn. Code Ann. § 66-3-303.  Further, when determining the transferor's liabilities, "a contingent liability, such as that of a guarantor, must be considered in determining solvency." *Davis v. Suderov (In re Davis)*, 148 B.R. 165, 176 (Bankr. E.D.N.Y. 1992), *aff'd*, 169 B.R. 285 (E.D.N.Y. 1994).  "[C]ontingent claims must be discounted to value as of the transfer date by the reasonable probability of the contingency at that time." *Official Comm. v. Sealed Air Corp. (In re W.R. Grace & Co.)*, 281 B.R. 852, 866 (Bankr. D. Del. 2002) (citing *In re Xonics Photochemical, Inc.*, 841 F.2d 198, 200  (7th Cir. 1988)).  *See also In re Davis*, 148 B.R. at 176 (explaining that when debtors "were almost certain to be called upon immediately to make good on their guarantee," the entire amount of the guaranty should be included in their liabilities).  A guaranty loses its contingent status when the primary obligor is in default on the loan "because default is the sole extrinsic event which triggers liability of the debtor to the creditor." *In re F.B.F. Indus., Inc.*, 165 B.R. 544, 548-49 (Bankr. E.D. Penn. 1994) (citing *In re Robertson*, 105 B.R. 504, 508 (Bankr. D. Minn.1989)). Indeed, "[i]t is well settled in Tennessee that when the guaranty is absolute, no demand or exhaustion of the maker is required" before the guarantor can be called to pay. *Klein v. Kern*, 28 S.W. 295, 296 (Tenn. 1894).  Consequently, in determining insolvency the guaranty must be included in a transferor's liabilities from the moment it is in default. *See, e.g.*, *In re F.B.F. Indus., Inc.*, 165 B.R. at 548-49.

In this case, the Debtor asserted that his parents were not insolvent at the time that they transferred Collectors Cove to him.  Mr. Mason also denied insolvency, and introduced into evidence was his personal financial statement dated September 5, 2009, which listed assets in excess of $4.3 million, and liabilities of less than $2.2 million, for a net worth of over $2.1 million. This

10

financial statement did not include the Collectors Cove inventory, because according to Mr. Mason, he had already verbally agreed to sell the business to the Debtor. With the inclusion of the inventory at the almost $400,000 figure in the Sale Agreement, the Masons' assets totaled approximately $4.7 million.

As to liabilities, the names of his creditors are not listed on Mr. Mason's September 5, 2009 financial statement, so it is not entirely clear to whom the $2.2 million listed therein is owed. But the evidence established that at the time Collectors Cove was transferred to the Debtor, Mr. Mason was a co-maker on five debts totaling $3,050,929.48 owed to the Bank,[10] he was personally obligated on six debts totaling $1,523,743.09 to First Tennessee Bank,[11] he owed State of Franklin Bank $368,812.79 on the debt later assumed by the Debtor, and he owed a second debt to State of Franklin Bank in the amount of $388,743.71, secured by a second mortgage on his home. Also appropriately included in a list of Mr. Mason's liabilities was his guaranty of Chuck Mason Equipment Sales' debt to CNH Capital America LLC in the amount of $2,677,940.22 that was in default and thus no longer contingent. Lastly, Mr. Mason listed $29,000 in his personal financial statement as money owed on bills and credit cards. Adding all of these numbers together establishes that the Masons' liabilities on October 1, 2009, totaled over $8 million. Comparing this liabilities amount with the assets total, it is evident that "the sum of the [the Masons'] debts [was] greater than all of [their] assets, at a fair valuation," Tenn. Code Ann. § 66-3-303(a), such that the Masons were insolvent at the time of the transfer. This conclusion is confirmed by Mr. Mason's own testimony that his finances did not materially change between September 5, 2009, and November 30, 2010, when he and wife filed for personal bankruptcy relief under chapter 7, listing total assets of $2,132,597 and total liabilities of $9,245,132.93.

---

[10] The amounts and dates of the five notes are as follows: $90,000 on August 7, 2009; $150,000 on August 15, 2009; $1,442,481.13 on August 15, 2009; $1,243,448.35 on August 15, 2009; $125,000 on February 21, 2008, and renewed October 20, 2009.

[11] According to the account histories, the balance on the six notes as of October 1, 2009 were as follows: note 3296 with a balance of $172,739.75; note 1509 with a balance of $356,440.63; note 7649 with a balance of $493,112.83; note 3349 with a balance of $90,577.80; note 6404 with a balance of $50,872.08; and note 8464 with a balance of $360,000.

The last badge of fraud, and one of the cornerstones of the Debtor's defense, is whether the Masons received reasonably equivalent value for the assets of Collectors Cove. To answer this inquiry, the court must first determine the value of the property transferred.

> Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied, but value does not include an unperformed promise made otherwise than in the ordinary course of the promisor's business to furnish support to the debtor or another person.

Tenn. Code Ann. §66-3-304(a). The phrase "reasonably equivalent value" is not defined by statute, but this court has recognized that "reasonably equivalent value is not an esoteric concept: a party receives reasonably equivalent value for what it gives up if it gets roughly the value it gave." *Webb MTN, LLC v. Exec. Realty P'ship, L.P. (In re Webb MTN, LLC)*, 420 B.R. 418, 433 (Bankr. E.D. Tenn. 2009) (internal quotation marks omitted). Indeed, "a determination of reasonably equivalent value is 'fundamentally one of common sense, measured against market reality.'" *Id*. at 434 (quoting *Lindquist v. JNG Corp. (In re Lindell)*, 334 B.R. 249, 256 (Bankr. D. Minn. 2005)). "Because valuation necessarily involves an approximation, the figure at which the court arrives need not be directly traceable to specific testimony if it is within the range of values that may be properly derived from consideration of all the evidence." *Id*. at 435 (internal quotation marks omitted).

Here, although there was some testimony as to the various valuations placed on the inventory by the Masons and the Debtor at different times, primarily related to whether the inventory was listed at cost or retail, the primary focus of the Bank's proof for purposes of determining reasonably equivalent value and damages was the value of the two tracts of real property. According to the Bank, the best evidence of the tracts' value was the 2009 Sullivan County tax assessments. These tax assessments, which were never challenged by either the Masons or the Debtor, placed the value of the 7.239 acre tract at $785,000 and the 1.39 acre tract at $447,000.

In contrast, the Sale Agreement between the Masons and the Debtor placed the values at $750,000 and $305,000, respectively. Mr. Mason testified that the values assigned to the assets in the Sale Agreement were based on their book values provided by his accountant. However, the evidence indicated that Mr. Mason had expressed a number of disparate opinions as to the fair market values of the two tracts of land. In Mr. Mason's February 20, 2007 personal financial statement and his November 20, 2008 personal financial statement, he valued the larger tract at $1.1

million, but at only $600,000 in his September 5, 2009 personal financial statement. The smaller tract was not listed in Mr. Mason's 2007 financial statement because he did not purchase it until February 2008, but in his 2008 financial statement Mr. Mason listed its value at $490,000, and then a value of only $260,000 in his 2009 financial statement. Later, in a June 2012 personal financial statement that Mr. Mason partially completed for the Debtor with the Debtor's help, Mr. Mason listed the values of the two tracts at $1.3 million and $400,000. In Mr. Mason's answers to interrogatories, he opined that the larger tract was worth $750,000 at the time it was transferred to his son, while the value of the smaller tract was $225,000.

At trial, Mr. Mason addressed the variation in numbers as it pertained to the smaller tract, stating that he had paid $305,000 for the property in 2008 and thought at the time that he had gotten a good deal since he received rental income on the property and it was in a perfect location, which would account for his $490,000 valuation in his 2008 financial statement. As to his subsequent $260,000 valuation in his 2009 financial statement, Mr. Mason testified that the building on the 1.39 acre tract had caught fire and burned heavily, such that it was no longer rentable or usable at the time the Debtor purchased the property.

The Debtor testified at trial that the values in the Sale Agreement were the parties' belief as to value at the time. In hindsight as to the 1.39 acre tract, the Debtor opined that the property had been worth only $260,000. In an email from the Debtor to First Tennessee Bank dated July 27, 2010, the Debtor valued the two tracts together at $900,000. Yet in his Schedule A filed in his bankruptcy case in March 2013, the Debtor under penalty of perjury listed the tax assessments of $785,000 and $447,000 as his opinion of value. Similarly, in the Debtor's disclosure statement filed November 19, 2013, he endorses the current 2013 county tax appraised values of $794,500 and $449,300 as the tracts' present market values. Lastly, as to valuation, a January 21, 2013 appraisal valued the 7.239 acre tract at $910,000.

Based on the various statements, the possible collective value of the two tracts range from a low of $900,000 to a high of $1.7 million. Valuation is always difficult, even when the court is called upon to determine current value based on evidence gathered near the time of trial. In this case, however, the court has the even more difficult task of ascertaining the "reasonably equivalent

13

value" of two tracts of real property five years after the fact, without the aid of contemporaneous appraisals, based on the participants' statements of value over the course of several years. Moreover, valuation as to the 2009 time frame is complicated by the fact that a recession began in this country in the fall of 2008, adversely affecting the market value of real properties, often dramatically.

Taking the larger 7.239 acre tract first, the court concludes that the Bank has established that the fair market value of the property at the time of its transfer was $785,000 as the Bank alleges. Other than in his 2009 financial statement, Mr. Mason's statements of value before this litigation arose ranged from $1.1 million to $1.3 million. Moreover, the Masons' 2008 tax return indicates that the cost alone, several years previously, of the 7.239 acre tract and the building located thereon was $750,000. While the Debtor placed a lower value in his 2010 email to First Tennessee Bank, the purpose of the email was unclear, and the subsequent appraisal of the property produced the higher $910,000 valuation. Accordingly, the court is confident of the $785,000 valuation for the 7.239 acre tract.

As to the 1.39 acre tract, the court concludes that the value at the time of the transfer was $400,000. While the 2009 tax appraisal does indicate a value of $447,000, there is no indication that this appraisal took into account the unrepaired fire damage sustained by the property that, according to Mr. Mason's undisputed testimony, made the property unrentable. On the other hand, the Debtor's assertion of a $305,000 or less value is also not supported by the evidence. Although Mr. Mason testified that he paid only $305,000 for the property, this amount is contradicted by his 2008 and 2009 financial statements, both of which indicate that his cost in February 2008 was $390,000. Further, on April 17, 2008, the State of Franklin Bank loaned $382,500 to the Masons, secured by a lien on the 1.39 acre tract, and it is doubtful that the bank would have done so unless the property had appraised considerably in excess of the loan amount. Moreover, even after the fire, the Debtor assumed the State of Franklin Bank debt, which had a balance at the time of the $368,062.70. It is unlikely that the Debtor would assume a debt of this magnitude unless the property was worth at least this amount, since Collectors Cove did not operate out of the smaller 1.39 acre tract at that time. Lastly, even without the fire damage being repaired, Mr. Mason with the Debtor's cooperation valued the realty at $400,000 in the June 2012 financial statement that he completed on the Debtor's

14

behalf, with the Debtor himself valuing the property at $447,000 in his bankruptcy schedules filed the next year.  Based on the foregoing, the court is satisfied that the 1.39 acre tract was worth $400,00 at the time of its transfer to the Debtor in 2009.

Adding the court's conclusions regarding the values of the two tracts of real property to the value of the other assets transferred as listed in the Sale Agreement produces a total asset value of $1,598,082 (inventory $393,082, miscellaneous assets of $20,000 and combined realty of $1,185,000).  However, the fact that the transferred assets had a fair market value in this amount does not mean that the Debtor received property with this value.  It is undisputed that the assets were heavily encumbered with debt, and that the Debtor did not acquire title free and clear of liens.  Accordingly, the Masons' equity in the transferred properties must be determined in order to ascertain the true value of the conveyed property.  *See* Tenn. Code Ann. 66-3-302(2) (defining asset as property of the transferor, but not "to the extent that it is encumbered by a valid lien").  As previously noted, a debt in amount of $368,812.79 was owed to the State of Franklin Bank on the 1.39 acre tract.  The 7.239 acre tract and the inventory were encumbered by five debts to First Tennessee Bank.  The account histories for these debts indicated that the balances owed totaled $1,163,743.09[12] as of October 1, 2009.  Consequently, the total debt encumbering the transferred assets was $1,532,555.88.  Subtracting this amount from the assets' fair market value establishes that the net value of assets transferred from the Masons to the Debtor was only $65,526.12.

According to the Debtor, as consideration for this equity he paid the $30,000 amount provided for in the Sale Agreement, and paid approximately $20,000 in vendor debt owed by Collectors Cove after he acquired the assets.  Neither contention, however, was adequately supported by the evidence.  Regarding the $30,000, the Debtor and Mr. Mason both testified that this obligation had been paid through some combination of cash or trade, including the Masons living in the apartment owned by the Debtor for $500 a month credit.  The Debtor also testified that he once had a file that established that the $30,000 had been paid in full, but the file had been lost when he moved in early 2014.  The Debtor conceded that the Bank's lawsuit alleging inadequate consideration had been pending since 2010, but countered that his attorney had never advised him

---

[12] *See supra* notes 3 and 8.

15

that he needed to preserve the records.  No testimony was given as to how long the Masons resided in the Debtor's apartment, nor was any documentary evidence introduced that would support the testimony that the  Debtor fully satisfied the $30,000 debt or paid any vendor debt.  The July 27, 2010 email from the Debtor to David Ellis with First Tennessee Bank listed the balance owed by him on the "Buyout of Business" as $26,500.  Yet five  months later in their bankruptcy schedules and statement of financial affairs the Masons listed the balance owed to them on the "Collectors Cove Note" as only $4,000, even though they also indicate that they had received only a total of $6,500 in 2009 and 2010 on this indebtedness.

While the court found both Mr. Mason and the Debtor generally credible, they were less so when testifying as to the sums paid by the Debtor on the $30,000 debt.  Further, the lack of any documentary evidence supporting the Debtor's claims that he paid or gave value in full satisfaction of the $30,000 and paid $20,000 in vendor debt is disquieting.  From the other evidence tendered in this case, it was evident that an accountant was regularly used for the business and to prepare tax returns, etc.  Thus, it is difficult for the court to believe that the Debtor would not have some evidence of payment.  Moreover, his statement that his attorney never advised him to keep records, even if true, provides no excuse.  The issue of the Bank's fraudulent conveyance claim has been in contention throughout the Debtor's bankruptcy case and before.  The Debtor's attitude generally at trial was that he had gotten more debt than assets, and that he should not have to pay any more.  While this is understandable, the court can not find without more evidence than their testimonies that the Debtor did in fact satisfy the $30,000 debt and pay $20,000 as additional consideration in the form of vendor debt.  Accordingly, the court concludes that only $6,500 of the $30,000 was satisfied, as set forth in the Masons' statement of financial affairs.  Consequently, based on equity transferred of $65,526.12, with payment in turn of only $6,500, the Debtor did not give reasonably equivalent value for the assets transferred to him.

Despite this conclusion, the evidence overall did not establish that the transfer of Collectors Cove was made with the actual intent to defraud, hinder, or delay a creditor, as contemplated by Tenn. Code Ann. § 66-3-305(a)(1).  Granted, the transfer was to an insider, the Masons were experiencing financial difficulties at the time and were in fact insolvent, and the transfer was for less than reasonably equivalent value.  However, it was undisputed that for years prior to the sale the

16

Debtor had been running the business, which had been started at his request as a teenager. The values attributed to the assets in the Sale Agreement were based on their book value and the transfer was not done in secret, with the secured creditors of the business being informed and the Debtor affirmatively assuming the business' secured liabilities. From all respects, it appears that the parties sought to handle the transfer legally and above-board. While the Masons were undeniably experiencing financial difficulties at the time of the transfer, it was not their only income-producing company. Their main business was Chuck Mason Equipment Sales, and even though it filed for bankruptcy relief shortly after the Sale Agreement with the Debtor was executed, the filing was a chapter 11 reorganization, with the case not converting to chapter 7 until a year later on November 30, 2010. Similarly, the Masons themselves did not file for bankruptcy relief until more than a year after the October 1, 2009 Sale Agreement.

The Bank argues that the Debtor did not have the financial means to take on a business of this size, as evidenced by his 2008 income of less than $20,000, the fact that the monthly debt service on the business' debt was in excess of $11,000, and the business' gross receipts in 2008 were only $315,712 with net income of only $64,686. While this evidence does cast some doubt on the wisdom of the Debtor's decision to purchase Collectors' Cove, the court is not convinced that it establishes that the sale was fraudulent. The Debtor had been running the business before the purchase, and the parties were confident that he could do so afterwards. It provided his family's livelihood, and from all indications the Debtor had developed an expertise with respect to the value of many of the collectibles. Moreover, the evidence indicated that the Debtor was in fact able to make payments on the outstanding indebtedness for a number of years after the purchase. While certainly the timing of the Masons' sale to the Debtor was not totally divorced from the Masons' overall financial woes, neither the timing nor the other alleged badges of fraud establish in the face of all of the other evidence to the contrary that the transfer was fraudulent. Consequently, the Bank's claim that the transfer was made with the actual intent to defraud, hinder, or delay creditors under Tenn. Code Ann. § 66-3-305(a)(1) must be rejected.

As is evident from the foregoing discussion on the badges of fraud, the Bank's constructive fraud claim under Tenn. Code Ann. § 66-3-306(a) has been established. The Masons made the transfer without receiving a reasonably equivalent value in exchange and were insolvent or became

17

insolvent as a result of the transfer. The Debtor should have paid $59,026.12 more than he did for the assets of Collectors Cove. And because the Debtor did not pay reasonably equivalent value for the assets, he is unable to take advantage of the defense provided by Tenn. Code Ann. § 66-3-309(a), despite his otherwise alleged good faith.[13]

### III.

The foregoing constitute the court's findings of fact and conclusions of law. In summary, the court finds that the Masons' transfer of the assets of Collectors Cove to the Debtor was not made with actual fraud under Tenn. Code Ann. § 66-3-305(a)(1), but it was constructively fraudulent under Tenn. Code Ann. § 66-3-306(a). Accordingly, an order awarding judgment to the Bank in the amount of $59,026.12 will be entered.

# # #

---

[13] In addition to the defense provided by Tenn. Code Ann. § 66-3-309(a), the Debtor raised Tenn. Code Ann. § 66-3-309(f)(2), which provides that a transfer otherwise voidable under Tenn. Code Ann. § 66-3-306(b) is saved if the transfer to an insider is "made in the ordinary course of business or financial affairs of the [transferor] and the insider." However, the Bank has not raised § 66-3-306(b) as a basis for avoiding the transfer in question, and the statute is inapplicable to the case at hand since it pertains to a transfer made to an insider for an antecedent debt. The transfer from the Masons to the Debtor was not for an antecedent debt. And, even if it had been, transferring the entire assets of a company is generally not in the ordinary course. *See, e.g., In re Am. Dev. Corp.*, 95 B.R. 735, 736 (Bankr. C.D. Cal. 1985) (corporate debtor's proposed transfer of all its assets to a subsidiary not in the ordinary course of business). Accordingly, any defense based on Tenn. Code Ann. § 66-3-309(f)(2) must be rejected.